## DECEMBER TERM, 1843.

### Heirs of Charles Land *v.* Heirs of Thomas Land.

The fact that both parties to a suit in chancery in the State courts, claim the land in controversy, under a treaty to which the United States is a party, has, in itself, nothing to exclude the jurisdiction of the State court.

The refusal of the agent of the United States, residing with the Indians, to *register* the application of the Indians, claiming under the 14th article of the Dancing Rabbit Creek treaty, does not affect the validity of the claim and application of such Indians.

The right of the head of a Choctaw family to a reservation under the 14th article of the Dancing Rabbit Creek treaty, *vested* whenever such Choctaw signified his intention, to the agent of the United States, of becoming a citizen of the State ; and that right became *complete* whenever a residence on the land, for five years subsequent to the ratification of the treaty, was accomplished.

This bill is filed by the heirs of Charles Land, and charges that their ancestor purchased from Betsey Beames, or Istanchi, her reservation under the 14th " article of the Treaty of Dancing Rabbit Creek," for eight hundred dollars, and took title therefor, and power of attorney to prosecute the claim. The former is lost or mislaid. The latter is filed, as an exhibit to the bill. That said Indian was the Choctaw head of a family, and had one unmarried child, living with her, over two years of age, who is since intermarried with the defendant Thomas Sims. That Istanchi resided upon Honey Island at the date of the treaty, within the district ceded by the treaty, and had a house and field on the tract, which, after the survey of the land, proved to be section 21, township 16, range 1, west. That, within six months from the ratification of the treaty, she signified her intention to Col. William Ward, agent of the United States for the Choctaws, of becoming a citizen, and taking lands, under the 14th article ; claiming for herself, in consequence of her improvements and residence, said section, and the west half of number 22, for her daughter. That she remained upon said land until 1831, when, having once been compelled to move her house to a different part of the tract by Thomas Land, she was driven off, and her house taken possession of by one Fatharee, and after his removal was filled with corn and fodder. That the year after, as soon as the corn and fodder were removed, and the house

left vacant, she took possession, and continued in possession until his death, which happened in December, 1836. That although much annoyed, and for a time compelled to leave her house, she always claimed it for her home. That Sims, and his wife Ann, sold, and transferred by quitclaim, all their interest, to Jno. B. Forester. That Forester's claim forms a cloud upon their title. That Sims and his wife, and Forester, all knew of the prior purchase of said land by their ancestor. That the east half of said section 21 was located by a floating claim, in the name of Josiah Doak. That Doak was a white man, and trader, and lived thirty miles from the place. That a float was granted to him, by a supplement to the treaty, for a half section, to be located upon any unoccupied and unimproved lands in the district in which he lived. That, without locating the float, he sold it to ——————, who sold it to Thomas Land, deceased, who located the same, in the name of Doak, upon the said east half of section 21, which embraced all Istanchi's improvements, with full knowledge of her claim, and of the sale she had made to Charles Land, and Thomas Land took immediate possession of said land, and retained it until he died, which was in June, 1839, since which his legal representatives have had possession and received the profits, which are worth from $500 to $1000 per annum, as there are two hundred acres of cleared land. Charges that the legal representatives are bound to account to them for the same.

Charges that defendant Johnson was appointed administrator of Thomas Land ; that he received the profits, and applied them to the use of the estate, which is insolvent ; that said administrator threatens to sell said half section, and appropriate it to the use of the estate ; that if he is permitted to do so it will embarrass their title. Asks a restraining order, and that he be charged with the rents and profits ; that this claim throws a shadow of suspicion or cloud upon their title ; that Charles Land died on the 28th July, 1834, leaving a will, directing his executors to sell all his real estate to pay his debts ; that complainants are his only heirs and legal representatives ; that the above claims throw a cloud upon the titles, and greatly embarrass the sale, of said real estate. Prays that the title be vested in them, clouds removed, for an account with John-

son, and à sale of the float to pay whatever is due them, as the estate is. insolvent ; that the title to the land in controversy be vested in them by conveyance from Thomas Land's heirs, and injunction against Johnson, and general relief.

The answer of Thomas Land's heirs, Johnson Cyrus Land (by his guardian *ad litem*), and William Land, states, that they have no personal knowledge of the sale by Betsey Beames, or Istanchi, to Charles Land, but they have heard of it, and demand proof ; that Istanchi was the Choctaw head of a family, at the time of the treaty, as they believe, and that she applied to Ward to have her name registered, which he refused to do. They deny that Thomas Land drove her off his place ; say that Fatharee threatened her, which induced her to leave. Admit that Charles Land took possession of said east half section 21, under the location of Doak. They charge that Istanchi voluntarily left the place, and that she never resided there after 1835. They say, that the representatives of Charles Land, before Thomas Land deceased located Doak's claim, said that they had despaired prosecuting with success the claim of Istanchi ; that, in consequence of that statement, Doak's claim was located there ; that, at the time of the location, Doak's claim was the only valid claim ; they admit that Istanchi was entitled to land under the 14th article of said treaty, but allege that she cannot interfere with the title of Doak, derived from the same treaty. Admit that Thomas Land cultivated until his death, in 1839, and Johnson until 1842. Think the rents and profits worth $2 per acre. That valuable improvements were made. Johnson says, that he never heard of the claim being set up, while he cultivated, until he advertised it for sale. Allege that 16th section of said township was reserved for said Istanchi, and exhibit the Register's certificate that it is still vacant. They deny fraud. Insist by way of demurrer, as if specially pleaded.

The answer of Thomas Sims and wife, admits the allegations of the bill, except the sale to Charles Land of the west half of section 22, which they positively deny. Admit their sale to Forester, and a quitclaim title to their interest in both sections 21 and 22.

The answer of Jno. B. Forester, admits, from belief, the general

Land v. Land.

allegations of the bill, except the sale of west half of section 22, to Charles Land, which he claims, as a purchaser from Sims and wife. Disclaims all interest in said section 21, although the deed from Sims and wife vested the legal title in him. Prays his answer may be taken as a cross-bill against the heirs of Charles Land, deceased, complainants. Calls on them for an answer, which is filed, admitting that Charles Land purchased only section 21, and that he never purchased, nor had any claim to, said half of section number 22, or any other half section, on account of said daughter of Istanchi.

The depositions fully establish the allegations of the bill. It was admitted by counsel that Ward was the agent of the United States for the Choctaw nation during the year 1831, and that Josiah Doak did not live on the land in controversy, either at the treaty or since, nor did he ever have any improvements on the same.

The Register's certificate, referred to in the answer of the defendants as exhibiting a reservation of the 16th section of the same township for Istanchi, recited that the reservation was merely *conditional*, and that the same section was afterwards unconditionally reserved for Ne-te-ka-chee, a chief; which last reservation was approved by the President of the United States on the 3d of June, 1836.

*S. S. Prentiss*, for complainants.

The bill in this case is framed upon a claim set up by complainants to section 21, township 16, range 1, west, and the north half section 22, in same section and range. This claim is derived through Betsey Beames, a Choctaw head of a family, from the 14th article of " The Dancing Rabbit treaty." It is averred that Betsey Beames was entitled, under said 14th article, to said section 21, as the place of her residence at the time of the treaty, and to the one half of section 22, on account of her child, then near 10 years of age. It is averred that Charles Land purchased, for a good and valuable consideration, her title and interest, and that the bond of title is lost. The bill further states, that one half of section 21 is claimed by the heirs of Thomas Land, under a purchase from one Doak, who floated upon it, and that John B. Forester

claims by purchase from one Sims and wife (which wife was Betsey Beames's daughter), said one half of section 22. The complainants abandon their claim to the one half of section 22, and insist upon a decree for quieting and confirming their title to section 21.

The evidence in the case is full and conclusive.    1st. That Betsey Beames was a Choctaw head of a family, and resided, and had an improvement at the time of the treaty, upon said section 21, in controversy.

2d. That she signified within six months after the treaty to Ward, the U. S. agent for that purpose, her intention of remaining and becoming a citizen, under the 14th art. of the treaty.

3d. That she resided on said improvement, in sec. 21, according to the provision of said 14th article, for five years and more, even till her death in December, 1836.

4th. That Betsey Beames sold to Charles Land her claim, for a negro, and an agreement to support her for life ; that said contract was in writing, Betsey Beames giving said Charles Land a bond for title, and hé delivering the negro and giving a bill of sale. All these facts are distinctly and plainly proven, by the depositions of Jonathan Revill, David D. Thomson, and Thomas Sims ; there is also a written admission by defendants' counsel, that Ward was the proper agent of the United States, to whom the Indians were to signify their intention of remaining.

Upon this state of facts, it seems to me to need no argument, to show that complainants have a complete equitable title to sec. 21, through Charles Land's purchase from Betsey Beames.

Betsey Beames acquired, by her residence on sec. 21, at the time of the treaty, her signification of intention to remain within six months, and her actual subsequent residence for five years, a complete legal title, under the treaty. It was, from the moment of signification of intention, a complete legal title, subject only to be defeated by a failure to perform the condition subsequent, of a residence of five years.

As to the character of Betsey Beames's title, see 5 Yerger, 323 ; 2 Yerger, 432 ; also, *Newman* v. *Doe, ex dem. Harris et al.*, 4 Howard, 522. In this latter case, the construction of this very 14th article, is given fully, and the character of title, derived under it, determined.

Land v. Land.

A removal before the expiration of the five years even, if involuntary, or caused by the threats or acts of others, will not constitute a forfeiture. 2 Yerger, 432, 438, 450; 5 Yerger, 343; 7 Yerger, 46; 8 Yerger, 461.

Doak's float, under which Thomas Land's heirs claim, was authorized to be located only on *unoccupied* and *unimproved* land; sec. 21, was both occupied and improved. Complainants ask for a decree, compelling Sims and wife to execute a quitclaim deed in fee simple to them, of sec. 21, in pursuance of the *bond for title*, given to Betsey Beames, the legal title having descended to Mrs. Sims, the sole child and heir of said Betsey, also a decree for account against Thomas Land's estate, and for possession of the lands, *and quieting* the claim set up by Thomas Land's heirs.

Complainants consent that a decree may be rendered in favor of J. B. Forester, for the portion of section 22 claimed by him in his cross-bill.

*Brooke*, for defendants.

The answer insists, by way of demurrer, on the insufficiency of the bill; this point will be noticed first. The demurrer is intended to apply to a want of jurisdiction of this Court, which, it is contended, exists. 1st. Because the case is one which arises under a treaty of the United States; and, therefore, cognizable only by the tribunals of the United States. 2dly. Because the acts of the U. S. agent, in refusing the application of the Indian, under whom complainants claim, and granting the reservation of the land in question, to the person under whom defendants claim, are judicial acts; performed by one of competent authority, and, therefore, not to be collaterally questioned, except for fraud.

1st. What is, or is not, a case arising under a treaty? For it is conceded that there are many instances of cases, wherein title may be derived from, or under, a treaty; and yet that title be recognized and protected in a State court. We conceive the rule of distinction to be this — Where the State court is called upon merely to decide upon the existence of facts, which constitute or give title under a treaty, and there is no officer or tribunal nominated in the treaty, to perform that duty, prior to the issuance of a

grant, then such court may well exercise jurisdiction, or in cases where one party claims under a State law. If, for instance, the 14th article of the Choctaw treaty, merely provided, that a residence by an Indian, of one, two, or three years, should confer title on him to any portion of the ceded territory; a State court, should the question arise before it, might inquire as to the fact of residence, and decide whether or not a title under the treaty had accrued. But, where the facts being admitted, the question arises, whether, under a particular construction of the treaty, such facts come within its provisions, it is conceived, that the federal courts alone are competent to decide; such is the case at bar. The question at issue rests wholly on the construction to be given to the 14th article of the treaty of Dancing Rabbit Creek; and both parties, as is shown by the bill, rest their claim upon it, and upon it alone. The judicial power of the United States Court is (Const. U. S. art. 3, § 2,) extended to all cases arising under treaties made, or to be made, under the authority of the U. S. In the case of *Chisholm* v. *The State of Geo.* (2 Dall. 419 – 475), Chief Justice Jay vindicates the exclusive jurisdiction of the United States courts in such cases, on the ground that, " because treaties are compacts made and obligatory on the whole nation, their operation ought not to be affected or regulated by the local laws or courts of a part of the nation." In *Owings* v. *Norwood*, lessee (5 Cranch, 348), Judge Marshall remarks, " that wherever a right grows out of, or is protected by a treaty, it is sanctioned against all the laws and judicial decisions of the States ; and, whoever may have this right, it is to be protected."

It is not easy to conceive of a case coming more fully within the reasons of the decisions quoted, than the one at bar. The question the Court is called upon to decide, is not, whether certain acts were, or were not, performed by complainants' grantor, so as to entitle her to a particular reservation ; but whether, by *construction*, the treaty does extend to her ; when, as is conceded, her name was not registered by the proper officer, as an Indian head of a family, as the terms of the treaty especially require. The fact, that both the parties to this suit claim under the Choctaw treaty, is one

Land *v.* Land.

much relied upon in this view of the case ; were it otherwise —
did one of the parties claim under a State law, adverse to the
treaty, this case might be classed among those, in which an ap-
peal lies from a State, to the federal tribunals. The law giving
the federal appellate courts jurisdiction in certain cases of appeal
from State courts, shows, in its terms, that this is the class of cases
referred to, viz. : cases where there is a conflict between a State
law and a law of the United States.

By the 25th section of the Judiciary act (L. U. S. vol. 2, p.
65), an appeal from a State court lies to the Supreme Court of
the United States ; where the validity of a treaty, or of an authority
exercised under the United States, *and the decision* (in the State
court), *is against the validity of such statute, treaty, or authority,*
&c. The restriction here annexed, shows, that those cases involv-
ing treaties or laws of the United States, were alone contem-
plated as being cognizable in a State court (subject to appeal to the
Supreme Court of the United States), wherein only one of the
parties claim under such treaty, or laws. For where a State law,
and a law of the United States, come in conflict, a State court
may properly assume jurisdiction, subject, however, to the appellate
power of the United States Court ; the laws of the United States
being supreme over those of the States. And this appellate power
is given to protect the laws of the United States from what might
be apprehended from a too partial leaning of a State tribunal
towards its own laws, when they might come before it, in conflict
with the laws of another power. But where the conflict comes not
between the laws of the State and a foreign power, but between
two different constructions of a law of this foreign power ; the rea-
son for the court of any power other than that, that made the law,
assuming jurisdiction, does not and cannot exist, where there are
courts deriving their authority from the said law-making power.
It is presumed, that this Court will not attempt to decide upon
rights, or to vest the same, where its decision may be nullified,
and those rights divested, by a legislative or executive act, deriving
its authority wholly from another independent government ; yet,
such might and possibly would be the result in this case, inasmuch
as action by Congress is contemplated on the subject of the con-

flicting claims arising under the Choctaw treaty — action, which might entirely set at nought any direction or construction, that a State court might give to said treaty. This consideration, alone, should furnish a weighty reason why this Court should decline interference with the subject.

It may be argued on the other side, that, although this is a case arising under a treaty or law of the United States ; that yet, the State courts may exercise a jurisdiction concurrent with the federal. Concurrent jurisdiction is granted to the State courts by act of Congress in particular cases, and by no construction of that act can we extend its provisions to this case. The cases enumerated in that act, are as follows :    (See L. U. S. vol. 2, p. 56, § 11.)

Suits of a civil nature at common law or equity, when the matter in dispute exceeds, exclusive of costs, the sum of $500.

1st. Where the United States are plaintiffs.

2d. Where an alien is a party.

3d. Where the suit is between a citizen of the State where the suit is brought, and a citizen of another State.

These are cases where the jurisdiction depends upon the character of the parties. There are other cases wherein the concurrent jurisdiction depends upon the subject-matter. These are determined by act of Congress ; March 8th, 1806 ; April 21, 1808 ; March 3, 1815 (see the cases enumerated, 1 Kent. 306), and also by the Judiciary act of 1789. They are cases arising under the revenue laws, and of such like nature ; and have no relation to a case of the kind at bar.

On this subject, see 2 Dall. 419, 475 ; 5 Cranch, 344 ; 1 Wheat. 355 ; 1 Kent. 306, 400 ; Conkl. Treatise of the Federal Judiciary, 8, 52, 92.

The result of the inquiry, then, on this subject, may be said to be this :—1. That where both parties claim under a State law, a State court has exclusive jurisdiction.    2. Where one party claims under a State law, and the other under a law or treaty of the United States, the State courts have a concurrent jurisdiction with the federal, subject to a right of appeal to the latter.    3. Where both parties claim under a law or treaty of the United States, the United States courts alone have jurisdiction.

2. It is contended that the agent appointed by the United States, for carrying out the provisions of the treaty of Dancing Rabbit Creek, was, *pro hac vice*, a judicial officer, and his acts not to be questioned collaterally by any court, except for fraud, which is not here alleged.

In a provision of the Cherokee treaty of 1817, 1819, similar to the 14th article of the treaty in question, in a case in Tennessee. 5 Yerger, 323, it was held, that the registry of the name with the agent, was conclusive evidence that the individual was an Indian head of family ; *e converso*, the refusal of the agent to register, must be conclusive evidence that the individual had failed to establish a claim to that character.

The treaty having appointed the agent for this purpose, he must be trusted as far as he acts under the authority conferred. He was not authorized to register any but Choctaw heads of families, and it is to be presumed he did his duty. 4 How. 554, 555 ; see also 1 Pet. 412 ; 13 Pet. 511 ; 12 Pet. 412. The agent in this case is distinguishable from that appointed by the Chickasaw treaty, and referred to in 5 How. 385. The Court there properly decreed, that he was a mere ministerial officer, his duty being merely to certify to a particular fact ; the power to judge or approve, on that certificate, being vested in the President.

But in this case, the agent was required to determine, himself, whether or not the applicant for the benefits of the 14th article of the treaty, was an Indian head of family. He was required to register only the names of such persons; and, of course, was vested with the power of judging whether the applicant answered this description.

The decision of a tribunal having jurisdiction over the matter can never be questioned, collaterally or incidentally, except for fraud : but a defect of jurisdiction may be noticed, whenever and wherever it appears. 1 Howard, 440; 6 Wheat. 128 ; 8 Cranch, 21 ; 2 Peters, 164 ; 1 Saund. 313 ; 1 Strange, 703 ; 2 ib. 102, 996.

Since the foregoing remarks were written, the act of Congress, passed August 23, 1842, on the subject of the conflicting claims arising under the 14th article of the treaty of Dancing Rabbit Creek, has been published, to which the counsel begs leave to refer the

Court.   All jurisdiction of the State courts over the subject-matter, if any existed, is of course taken away by this act.

In the bill, the date of the assignment by Istanchi to complainant's father, is left blank ; but if properly filled up, it would be shown that said assignment was made long prior to the expiration of five years from the date of the treaty.   By the 9th section of the act referred to, such an assignment is void.

The counsel herewith submits to the Court a newspaper-copy of said act, which, it is presumed, is correct.

By further reference to said act, it will be seen that the complainants' do not, in other respects, bring themselves within the provisions thereof.

See sec. 3d.   If it is sufficiently proven that Istanchi, or Betsey Beames, made application in time to have her name registered, yet the defendants contend that the location of Doak on the land, is such a disposition of it by the United States, or by its authority, as will preclude the complainants, by the terms of said 3d section. There are various other requisitions in said section, which are not shown to have been complied with ; and, therefore, this Court cannot undertake to do what the special commissioners of the United States cannot do.   See, particularly, said sec. 3, of said law : see also secs. 8 and 9.

CHANCELLOR.   The complainants, as the heirs of Charles Land, deceased, claim title to a tract of land, situate within the Choctaw District, in this State ; being section No. 21, in township 16, range 1, west.   They show that the title is derived through their ancestor, by purchase from an Indian woman by the name of Istanchi, alias Betsey Beames, who, as the head of a Choctaw family, claimed title to the land, under the provisions of the 14th article of the Dancing Rabbit Creek treaty, concluded between the United States and the Choctaw tribe of Indians, on the 27th day of September, 1830 : she sold to Charles Land, and gave her bond to make title as soon as her title was perfected under the terms of the treaty.   By the article referred to, each head of a Choctaw family, desiring to become a citizen of the State, by signifying such intention to the agent of the United States, within six months from

the ratification of the treaty, became entitled to a section of land, for which a grant in fee simple was to be issued, after a residence of five years thereon. The testimony in the case, proves the continued residence of Istanchi upon section 21, for the period of five years ; and establishes a compliance, on her part, with all the requirements of the treaty necessary to perfect her title to the land. The complainants set up title to the east half of said section, under a location of what is commonly called a *floating claim*, made in the name of Josiah Doak, to whom a right is given by the supplement to said treaty, of locating a half section of land, upon any *unoccupied* and *unimproved* land in the district where he lived. The complainants pray that the representatives of Thomas Land may be compelled to relinquish to them all title acquired under the location of said *floating* claim, and that Sims and wife may convey, by quitclaim deed, all the title to said section which descended to them as the heirs of Istanchi. As the allegations of the bill are fully sustained by the proofs, the mere question of title between the parties seems to be the leading question for decision. The defendants insist that the Court can give no relief in this case : 1. Because it arises under a treaty made by the United States with the Indians, both parties claiming under that treaty; that the case is, therefore, exclusively cognizable in the courts of the United States. 2. It is insisted, that the refusal of the agent residing with the Indians to register the application of Istanchi, was final and conclusive upon her rights, as a judicial act, and cannot be questioned in this Court.

1. I do not think that there is anything in the first point made by the defendant. The fact that both parties claim title under a treaty to which the United States is a party, has nothing in itself to exclude the jurisdiction of this Court. Although the 2d section of the 3d article of the Constitution of the United States declares, that the judicial power shall extend to all cases, in law or equity, arising under treaties made by their authority, yet it does not confer exclusive jurisdiction upon the federal courts, in all such cases. The mere fact that the rights of the parties to the land in controversy grew out of a treaty, cannot have the effect of ousting the jurisdic-

tion of the Court, when both parties, and the subject-matter of the suit, are otherwise completely within its cognizance.

This is a mere matter of private litigation between citizens of the same State, relating to a subject within the ordinary jurisdiction of a court of equity, involving no question affecting the public, or touching the relation of either of the contracting parties to the treaty. I find nothing in the nature of the claims of the parties litigant, or in the source from which they are derived, which confers exclusive jurisdiction on the federal courts. The 25th section of the judiciary act of 1789, furnishes a legislative exposition of the 2d section of the 3d art. of the constitution, directly opposed to that now urged for the defendants in this case. That act provides, that the judgments of the highest court of a State, in which was drawn in question the construction of any clause of a treaty, where the decision is against the title of either party, set up under the treaty, such decision may be reëxamined, reversed, or affirmed by the Supreme Court of the United States. Thus it appears, that the right of a State court to take original jurisdiction of a question of private right, growing out of a treaty, was fully recognized by the very government that is supposed to forbid it.    2. As to the second objection, I see nothing in the terms of the treaty, which clothed the Choctaw agent with such power and discretion as is here claimed for him.    I do not find that the right of an Indian to the contemplated reservations, under the treaty, is made to depend finally, and conclusively, upon any lawless discretion, or arbitrary caprice, which the agent might choose to play off, in regard to them.    The conditions upon which such right is made to rest, are embodied in the treaty itself, and could not be impaired, restricted, or modified by the mere will of the agent, or of any other power.    The right to a reservation depended upon the fact, that Istanchi was the head of a Choctaw family, and that she "*signified*" her intention to the agent, of becoming a citizen of the State.    Upon such application her right vested, and became complete and perfect, after a residence upon the land of five years, subsequent to the ratification of the treaty ; and the abstract right was not rendered the less perfect, by the refusal of the agent to register her name, and application.    It was

Land *v.* Land.

his duty to register the application ; but his arbitrary refusal, or wanton neglect, to comply with his duty, could not have the effect of divesting a right accruing under the treaty, which had thus been in part distinct from, and independent of, his sanction. His duties were those of a mere recorder, and were purely ministerial in their character, having nothing of the conclusive attributes of a judicial sentence. Here it is in evidence, that the Indian woman applied, through her agent, to be registered according to the terms of the treaty, and the agent refused to note the application, saying she ought to go west of the Mississippi river. If this refusal was sufficient to exclude her claim, then it was perfectly within his power to defeat one of the most important parts of the treaty. Even if the powers of the agent were judicial and conclusive in their character, still his conduct, in reference to this claim, could in nowise affect its validity, because the sentence or judgment of a judicial tribunal, is only conclusive upon the matter actually considered and adjudged. But here nothing was decided, but simply a refusal to take cognizance of the application. Upon the whole, I shall direct a decree, declaring the complainants entitled to the section of land, No. 21, and appointing a commissioner, to convey to them all the title thereto, acquired by the representatives of Thomas Land, through the *float* located in the name of Josiah Doak, as also all the title which Sims and wife acquired thereto, by descent, as the heirs of Istanchi. The bill must be dismissed as to Forester ; the complainants having acquired no title by their purchase from Istanchi to the land reserved by the treaty to her daughter.